# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) 2:14-cr-64 |
| v. | ) |
| | ) |
| KENYATTA ROBINSON, | ) |
|            Defendant. | ) |

## MEMORANDUM OPINION

Pending before the Court is DEFENDANT'S MOTION TO SUPRESS PHYSICAL EVIDENCE WITH CITATION OF AUTHORITIES (ECF No. 27) filed by Kenyatta Robinson ("Defendant"). The motion has been extensively briefed, and the Court has held an evidentiary hearing. (ECF Nos. 35, 41, 44, 62, 65). Accordingly, the motion is ripe for disposition.

**I. Background**

    **A. Procedural History**

On March 11, 2014, a grand jury returned a two-count indictment against Defendant, which charged him in Count One with possession with intent to distribute 280 grams or more of crack and in Count Two with possession with intent to distribute less than 500 grams of cocaine on November 1, 2013. On September 4, 2014, Defendant filed a motion to suppress the evidence seized by Detective Sean Rattigan from the vehicle Defendant was driving on the date of his arrest. As this Court previously explained, Defendant made three separate but related claims in his motion:

> First, Defendant alleges that Detective Rattigan searched the Tahoe immediately following his arrest without having probable cause to believe that evidence would be found. Second, he alleges that the Tahoe was seized and towed to Police Headquarters without probable cause. Third, he argues that the search of the Tahoe at Police Headquarters was invalid because the affidavit of probable cause contained several false statements of fact, without the inclusion of which probable cause would allegedly not have existed. Thus, Defendant requests that Court

1

> schedule an oral argument or a hearing on the motion and, furthermore, that the Court suppress "all fruits of the November 1, 2013 searches of, and seizures from the Chevrolet Tahoe."

Mem. Order of Nov. 20, 2014, at 4, ECF No. 45 (quoting Def.'s Mot. at 9, ECF No. 27). Briefing followed, with the parties focusing almost solely on the *Franks v. Delaware*, 438 U.S. 154 (1978) aspect of Defendant's motion. Thereafter, the Court issued a Memorandum Order, in which it refocused the issue away from the *Franks* aspect of the motion, explaining that any alleged defects in the warrant affidavit were irrelevant as long as there was probable cause, which would have allowed the police to search the Tahoe without a warrant under the automobile exception. *Id.* at 7-8. In that same Memorandum Order, the Court scheduled a suppression hearing so that it could resolve the key issue of fact raised by Defendant's motion – whether Detective Rattigan searched the Tahoe while it was parked on Lemington Avenue before being towed to Police Headquarters (i.e., what Defendant has described as a "free peek").

**B.     Findings of Fact**

The Court conducted a suppression hearing on December 12, 2014, and December 15, 2014. The Court heard from several witnesses, two of whom, Detective Rattigan and Deputy Sheriff Richard Dwyer, were called by the government. Detective Rattigan has worked for the City of Pittsburgh Police Department since December 2001. Hr'g Tr. at at 26:1, ECF No. 55. He has been assigned to the FBI safe streets gang task force for a little over a year. *Id.* at 25:22-24, 26:10. He is also currently a member of the SWAT team. *Id.* at 26:9. He formerly worked as a patrol officer, as part of narcotics investigations, and as a member of the impact unit. *Id.* at 26:8-9. As of the date of the suppression hearing, Deputy Dwyer was a detective with the Allegheny County Sheriff's Department, assigned to the U.S. Marshals fugitive task force. *Id.* at 86:15-17. He had been employed with the Sheriff's Department for approximately 23 years and had been a

member of the task force since 2012. *Id.* at 86:20. For his part, the Defendant called six witnesses to testify at the hearing: Cheryl Harrison, Defendant's mother; Alvin Burtch and Donald McCune, two men who were with Defendant at the time of his arrest; Jeanelle Cooper, Defendant's sister; Tara Snowden, a neighbor; and Angel Allen, Defendant's friend. Based on the testimony and evidence presented at the suppression hearing, the Court makes the following findings of fact relevant to the determination of Defendant's motion.

Defendant's mother lives at a residence located at 7013 Lemington Avenue in Pittsburgh, Pennsylvania. *Id.* at 10:1. Defendant's mother is the owner of a silver Chevrolet Tahoe with Pennsylvania registration JBM-7135. *Id.* at 9:18-21. She was not the primary driver of the Tahoe; rather, she considered "all [of her] kids" to be the primary drivers. *Id.* at 12:20-24. Essentially, the vehicle was at her house and whoever needed to use it, could use it. *Id.* at 13:13-15. Up to seven people, including Defendant, used the vehicle at any given time. *Id.* at 13:2-6. Defendant's mother "always" permitted Defendant to use the Tahoe, *id.* at 10:12, and he "drove it a lot," *id.* at 16:12.

At some point prior to November 1, 2013, Defendant absconded from a halfway house where he had been staying as a condition of his parole on an unrelated criminal offense and began living with his mother. *Id.* at 14:21-25. After Defendant left the halfway house, a warrant was issued for his arrest, and the fugitive task force had been searching for him for some time. *Id.* at 15:11-13, 98:15-16. In the days leading up to November 1, 2013, Detective Rattigan received a tip from an informant regarding Defendant's whereabouts. *Id.* at 28:25 – 29:1-2. Based on the tip, it was believed that Defendant was at his mother's residence on Lemington Avenue. *Id.* at 88:16-17. As a result, on November 1, 2013, Detective Rattigan set up surveillance of Defendant's mother's residence. *Id.* at 29:19-21. Detective Rattigan was familiar

with Defendant, having arrested him for an unrelated offense in the early 2000s. *Id.* at 29:6-9. During that arrest, Defendant fought with Detective Rattigan and drugs and firearms were seized from him. *Id.* at 29:10-12. Detective Rattigan was also familiar with Defendant's criminal history, including his record of prior felony drug convictions. *Id.* at 31:14-20.

At approximately 2:00 p.m. on November 1, 2013, Detective Rattigan parked his unmarked car down the block from 7013 Lemington Avenue. *Id.* at 33:14-21. Shortly after he arrived, Detective Rattigan observed the silver Tahoe parked across the street from Defendant's mother's residence. *Id.* at 32:20-21. Moments later, Detective Rattigan saw a man, later identified as Defendant, exit the porch of the residence and get into the Tahoe. *Id.* at 34:14-19, 34:23-25. Defendant then drove past Detective Rattigan's car, at which point Detective Rattigan was able to identify Defendant as the driver. *Id.* at 34:24-25 – 35:1-7.

Detective Rattigan followed Defendant down Lemington Avenue. *Id.* at 36:6-7. Meanwhile, he notified the fugitive task force of his observations. *Id.* at 36: 7-9. Defendant drove a few blocks to Laporte Street, exited the Tahoe, and entered an unspecified residence. *Id.* at 36:25 – 37:1. All the while, Rattigan maintained contact with members of the fugitive task force, updating them that Defendant was parked on Laporte Street and no longer in his vehicle. *Id.* at 36:23-25. About 15 to 20 minutes later, Defendant re-appeared. *Id.* at 36:13-19. Detective Rattigan did not actually see Defendant re-enter the Tahoe; he only saw the Tahoe "pull back up on Laporte Street," at which point he called the fugitive task force to alert them that Defendant was on the move again. *Id.* at 38:14-17.

Defendant returned to Lemington Avenue and parked the Tahoe in front of 7009 Lemington Avenue, which is one house over from Defendant's mother's residence. *Id.* at 36:21-22, 40:3-4. Detective Rattigan followed the Tahoe back to Lemington Avenue, positioning

4

himself on the side of the street opposite from the residence. *Id.* at 40:18-22. Detective Rattigan observed Defendant step out of the Tahoe and then, standing in the open driver's side door, reach toward the passenger side area and "mess[] with some . . . shopping bags." *Id.* at 41:3-6. Detective Rattigan then witnessed Defendant remove what appeared to be a small, white bag from the passenger side of the vehicle and place it in his right front pants pocket, before closing the door and walking into the front yard of 7013 Lemington Avenue. *Id.* at 41:6-9. Based on Defendant's prior history and the size, shape, and whitish color of the bag, along with his years of experience in narcotics investigations, Detective Rattigan believed that the bag Defendant removed from the Tahoe contained cocaine. *Id.* at 41:14-17, 58:9-13.

As Defendant entered the front yard, Deputy Dwyer and additional task force officers arrived on the scene. *Id.* at 41:25 – 42:1-2. After confirming that Defendant was among the men standing on or near the porch of the residence, Dwyer radioed that they were "green, meaning we were just going to drive straight there and jump out, secure the residence and attempt to apprehend Kenyatta Robinson." *Id.* at 91:4-6. To that end, Deputy Dwyer and the other task force officers parked directly in front of the residence, exited their vehicles, and headed toward the porch with Dwyer in the lead. *Id.* at 91:10-11. Deputy Dwyer encountered Defendant sitting in a chair on the left side of the porch. 91:12-16; 100:2-3. Three other men – Alvin Burtch, Donald McCune, and Lawrence Harrison – were also on or near the porch. *Id.* at 100:2-3 – 100:6-7. The officers ordered all of the men to the ground and placed them in handcuffs. *Id.* at 91:17-19. After being ordered to the ground, Defendant dropped the keys to the Tahoe onto the floor of the porch. *Id.* at 92:4-5. Dwyer picked up the keys and eventually gave them to Detective Rattigan. *Id.* at 93:8, 101:11-12. Dwyer also searched Defendant incident to his arrest and found more than $1,400.00 in U.S. currency in Defendant's left pocket and a vacuum sealed bag with

white residue rolled up in Robinson's right pocket. *Id.* at 91:19-20, 93:18-24.

In the meantime, Detective Rattigan, who was not involved in the actual arrest of Defendant, positioned himself near the Tahoe. *Id.* at 43:8-15. After Defendant was taken into custody, Detective Rattigan spoke with Deputy Dwyer, who told Detective Rattigan that Defendant had dropped the keys to the Tahoe and that a search incident to his arrest had revealed cash and a vacuum sealed bag containing white, powdery residue. *Id.* at 44:23, 45:8-13.

Thereafter, Detective Rattigan called Detective Fallert, a Pittsburgh Police Officer who is also involved in drug investigations, to the scene to assist in determining whether or not to obtain a search warrant for the Tahoe. *Id.* at 46:8-11. Upon his arrival, Detective Fallert field tested the vacuum sealed bag seized from Defendant's right pocket, and the white, powdery residue tested positive for cocaine. *Id.* at 47:22-24. Detective Rattigan also decided to call a K-9 unit to the scene. *Id.* at 48:11. As he waited for the K-9 unit to arrive, Detective Rattigan maintained surveillance of the Tahoe. *Id.* at 49:7-9. He did not, however, search the Tahoe prior to the K-9 unit's arrival. *Id.* at 49:12. Pittsburgh Police Officer Brian Roberts and his K-9, Dex, arrived on the scene at approximately 3:51 p.m. in order to conduct an exterior sniff of the Tahoe. *Id.* at *Id.* at 49:5, 53:4-8. While the exterior sniff was taking place, a number of Defendant's family members, friends, and neighbors congregated outside 7013 Lemington Avenue. *Id.* at 52:3-7. These individuals were shouting at the law enforcement officers. *Id.* 52:8-21. As a result of the commotion, Officer Roberts, at one point during the exterior sniff, had to tell people to back away from the Tahoe because they were distracting Dex. *Id.* at 52:22-24. Eventually, Officer Roberts was able to complete the exterior sniff, at which point he informed Detective Rattigan that, in his opinion, Dex had alerted to the presence of drugs on the driver's side of the Tahoe. *Id.* at 53:22-23. Armed with his observations of Defendant, the positive field test for cocaine, and

Dex's positive alert, Rattigan decided to seek a warrant to search the Tahoe.[1] *Id.* at 54:5-6.

Detective Rattigan was not involved in actually drafting the affidavit of probable cause for the warrant; that task fell to Detective Fallert. Instead, Detective Rattigan remained on the scene waiting for a tow truck to take the Tahoe to Police Headquarters. *Id.* at 55:10. He decided to tow the vehicle because it was not safe to search the vehicle at the scene, due to the crowd of people gathered in the vicinity. *Id.* at 54:21-25 – 55:1. As he awaited the tow truck, Detective Rattigan entered the unlocked Tahoe, put the key into the ignition, rolled up the windows, locked the doors from the inside, and shut the door. *Id.* at 55:10-12. While inside, he did not look through anything. *Id.* at 55:15-17. He did, however, notice the plastic bag in which the drugs were eventually found, though he could also see the bag while standing outside the vehicle. *Id.* at 76:22-23, 82:8-11.

Sometime between 4:00 p.m. and 7:00 p.m., the Tahoe was towed to the Police Headquarters in the North Side. *Id.* at 56:14-19. In the intervening time, Allegheny County Court of Common Pleas Judge David R. Cashman issued the search warrant for the Tahoe, which had been prepared by Detective Fallert. *Id.* at 56:23-25. The Tahoe was then searched, and Detective Rattigan discovered the drugs that are the subject of Defendant's motion in a plastic bag in the front passenger side of the vehicle. *Id.* at 57:10, 57:11-19.

---

1. Detective Rattigan testified that he wanted to obtain a search warrant because although he believed that the Tahoe contained drugs, he was unsure of the quantity of drugs. Hr'g Tr. at 50:20. If it was a small amount of drugs, he knew that the case would likely be charged in state court, and any search of the vehicle would need to be supported by a warrant. *Id.* at 50:12-15. If, however, the vehicle contained a large quantity of drugs, Detective Rattigan knew that it would likely be taken federal, in which case he knew that a warrantless search of the vehicle would be valid so long as there was probable cause. *Id.* at 50:11. Thus, he wanted to obtain a warrant in offense the state was charged in state court. *Id.* at 55:1.

7

## II. Discussion

As an initial matter, the government challenges Defendant's standing to contest the search of the Tahoe, which was registered to his mother and not to him.[2] "Fourth Amendment standing 'requires that the individual challenging the search have a reasonable expectation of privacy in the property searched . . . and that he manifest a subjective expectation of privacy in the property searched[.]'" *United States v. Kennedy*, 638 F.3d 159, 164 (3d Cir. 2011) (quoting *United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000)). The Court of Appeals for the Third Circuit has instructed that "whether the driver of a car has the reasonable expectation of privacy necessary to show Fourth Amendment standing is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it; ownership is not necessary." *Baker*, 221 F.3d at 440 (citations omitted). In *Baker*, for example, the defendant borrowed a car from a friend and had been driving it for four to six weeks whenever he was arrested on a parole violation – for, of all things, driving to the parole office without a license. *Id.* Whenever the defendant was stopped, he had the keys to the car, and there was no evidence that

---

2. The Court notes that the government has not argued that Defendant's status as a fugitive from a halfway house gave him a diminished expectation of privacy, such that only reasonable suspicion – or no level of suspicion at all – may have justified the search of the Tahoe. It seems that Defendant's status would have such an effect. *See, e.g.*, *United States v. Randolph*, 210 F. Supp. 2d 586, 590-91 (E.D. Pa. 2002), *aff'd*, 80 F. App'x 190 (3d Cir. 2003) (holding that a parolee who was a fugitive from a halfway house did not have a reasonable expectation of privacy in a room in a house in which he lived while on the run and thus a warrantless search of the room was valid). Our Court of Appeals has not, however, definitively answered this question. *See United States v. Donahue*, 764 F.3d 293, 299 (3d Cir. 2014) (declining to address issue of whether fugitive could assert reasonable expectation of privacy because the government did not preserve the issue for appellate review but "not[ing] that inmates generally do not possess a legitimate expectation of privacy, and other courts of appeals have held that prisoners do not re-acquire the right to such an expectation when they escape from prison or when they abscond after a mistaken release") (internal citations omitted). Nonetheless, because the parties have not addressed this issue, the Court will assume that the standing inquiry is unaffected by Defendant's fugitive status. Like the parties, the Court will also assume that probable cause, and not some lesser standard, was required for the search.

the car was stolen. *Id.* Faced with these facts, the Court of Appeals concluded that "[a]lthough [the defendant] did not own the car, he had substantial control over it insofar as he had borrowed it from a friend and had been driving it for four to six weeks." *Id.* Because "[t]here [was] clear evidence of continuing possession and control, as well as no evidence that the driver obtained the car illegitimately[,]" the Court of Appeals held that the defendant "had a reasonable expectation of privacy in the car." *Id.* "*Baker* thus stands for the proposition that, in conducting the 'fact-bound' inquiry into whether a driver has a legitimate expectation of privacy in a car, a person who lawfully borrows a car from another and exercises substantial control over it may well have a legitimate expectation of privacy." *Kennedy*, 638 F.3d at 164.

In this case, Defendant "always" had permission to use the Tahoe from his mother, its registered owner, and he apparently drove it "a lot." If those were the only facts known to the Court, the analysis would end there, and the Court would be left to conclude that Defendant had a reasonable expectation of privacy in the Tahoe. But those are not the only facts. As the testimony at the suppression hearing made clear, a number of other individuals *also* had free access to the vehicle and could use it whenever they desired, though it is unclear whether they used the vehicle more or less often than Defendant. The Court agrees with the government that this fact certainly weakens Defendant's claim to standing. *Cf. Rakas v. Illinois*, 439 U.S. 128, 146 (1978) ("[T]here comes a point when use of an area is shared with so many that one simply cannot reasonably expect seclusion.").

The Court need not resolve whether this fact completely undermines Defendant's claim, though. Even if Defendant had a reasonable expectation of privacy in the Tahoe, the Court concludes that there is no basis to suppress the evidence seized from the vehicle. First, the search of the Tahoe was lawful under the automobile exception because the police had probable cause

9

to believe that the Tahoe contained drugs. Second, based on the facts adduced at the suppression hearing, the Court finds that no search of the Tahoe took place prior to the development of probable cause. Thus, Defendant's "free peek" argument is without merit.

> **A. Because the police had probable cause to believe that the Tahoe contained drugs, they could search the Tahoe under the automobile exception.**

"The automobile exception permits vehicle searches without a warrant if there is 'probable cause to believe that the vehicle contains [contraband or] evidence of a crime.'" *United States v. Donahue*, 764 F.3d 293, 299-300 (3d Cir. 2014) (quoting *United States v. Salmon*, 944 F.2d 1106, 1123 (3d Cir. 1991), *abrogated on other grounds by United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013) (en banc)). "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, --- U.S. ---, 133 S.Ct. 1050, 1055 (2013) (internal citations, quotation marks, and brackets omitted). "The test for probable cause is not reducible to 'precise definition or quantification.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)). Rather, it is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Pringle*, 540 U.S. at 370 (internal citation and quotation marks omitted). The Court must, therefore, "evaluate 'the events which occurred leading up to the . . . search, and then [decide] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause.'" *Donahue*, 764 F.3d at 301. "If there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "It is also well-established that, looking at the totality of the circumstances, a dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause

necessary to search the car without a warrant." *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010) (citations omitted).

Applying this framework, the Court concludes that Detective Rattigan had probable cause to search the Tahoe. The following facts are pertinent to that finding. First, Detective Rattigan was familiar with Defendant's criminal history and, in particular, his prior felony drug convictions. Second, Detective Rattigan observed Defendant pull out what appeared to be a bag containing white powder, which Rattigan believed to be cocaine, from inside the Tahoe and put it in his right front pocket.[3] Third, after Defendant was arrested, Detective Rattigan learned from Deputy Dwyer that a vacuum sealed bag had been retrieved from Defendant's pocket during the search incident to his arrest. Finally, Detective Rattigan also learned that the white, powdery residue contained within that bag tested positive for cocaine. Based on all of that information, it was eminently reasonable for Detective Rattigan to believe that the Tahoe from which Defendant had just exited moments before might contain more drugs or evidence of criminal activity. *See, e.g.*, *United States v. Swallows*, No. 1:12-CR-148, 2013 WL 5773261, at *5 (E.D. Tenn. Oct. 24, 2013) (citing *United States v. Johnson*, 383 F.3d 538, 545 (7th Cir. 2004)) ("Finding illegal drugs on a person who has just exited a vehicle can provide probable cause to believe further evidence of a drug crime might be found in the vehicle."). But there is more. Lest there was any question about whether there was probable cause to search the Tahoe, Dex answered it when he

---

3. Defendant argues that Detective Rattigan's testimony about what he saw Defendant doing as he exited the Tahoe is not credible, but the Court disagrees – and contrary to Defendant's suggestion, the Court does not need an oral argument to arrive at that conclusion. Defendant did nothing at the suppression hearing to undermine Detective Rattigan's credibility. Additionally, it requires no great leap of logic to believe that, from his vantage point down the block (be it 50 yards away or somewhat closer, as was suggested at the suppression hearing), Detective Rattigan could see what he testified that he saw. He had an unobstructed view of Defendant as he exited the vehicle, and Defendant's right side pocket, into which he placed the bag, would necessarily have been facing Defendant's direction as he leaned back into the Tahoe.

positively alerted to the presence of drugs inside the vehicle.

Now, Defendant has attempted to cast doubt on the reliability of Dex's alert. His efforts are unavailing, however. As the Supreme Court explained in *Harris*:

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

133 S.Ct. at 1057. Following the suppression hearing, the government submitted a copy of a "Certificate of Completion" indicating that Officer Roberts and Dex "successfully completed the required 480-hour Dual Purpose Patrol/Narcotic Detective Course" on May 10, 2013. ECF No. 57. Thus, the Court can presume that the dog's alert was sufficient to establish probable cause. While several of Defendant's witnesses testified at the suppression hearing and/or stated in their affidavits that Officer Roberts appeared to have improperly manipulated Dex into alerting, none of these individuals possess any knowledge about how to conduct a K-9 sniff, what a proper sniff looks like, or how Dex normally alerts. This was made painfully clear during the government's cross examination of Alvin Burtch. Although Burtch had never seen a K-9 sniff in real life, he testified that he knew how they were properly conducted because he had seen one on TV. Hr'g Tr. 33:10-16, ECF No. 56. He also attempted to bolster his testimony by explaining, quite unbelievably, that he had read books about drug detection dogs, but he could not identify any such books by their title. *Id.* at 34:15-16, 21-22. Despite his professed knowledge, Burtch answered negatively when asked whether he knew "the manner in which a drug detection dog alerts[.]" *Id.* at 35:21-23. Without such a basis for comparison, it is just as likely that Burtch and the other individuals were describing proper police behavior as it is that they were describing improper manipulation. Consequently, their testimony is not enough to undermine the Court's

faith in Dex's positive alert.[4]

Two results necessarily follow from the Court's conclusion as to the existence of probable cause. First, under the automobile exception, the police did not have to search the Tahoe on the spot. Instead, in light of the ongoing commotion outside the residence, the police were entitled to secure the Tahoe, tow it to Police Headquarters, and search it later that day, as they did. *See Donahue*, 764 F.3d at 300 (explaining that "the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search"). Second, as the Court intimated in its prior Memorandum Order, because the search falls within the automobile exception, "any infirmities in the search warrant application are irrelevant[.]" *United States v. Holleman*, 743 F.3d 1152, 1158 (8th Cir. 2014) (citing *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996)). Therefore, the Court need not address Defendant's argument under *Franks* regarding the allegedly false statements in the warrant affidavit. *See United States v. Dennis*, 527 F. App'x 221, 222 n.4 (3d Cir. 2013) (not precedential) (declining to address validity of challenged search warrant "[b]ecause the warrantless search [of the automobile] was supported by probable cause"); *United States v. Brown*, No. CRIM.09-145(JNE/RLE), 2009 WL 2982934, at *14 n.22 (D. Minn. Sept. 14, 2009), *aff'd*, 653 F.3d 656 (8th Cir. 2011) ("In view of our conclusion, that the automobile exception permitted an immediate search of the blue Chevy

---

4. The Court declines Defendant's request for an additional evidentiary hearing on the issue of the K-9 unit's training and certification. Although Defendant did not receive a copy of the "Certificate of Completion" until after the suppression hearing, he had more than ample time prior to that hearing to come forward with some credible evidence to undermine the credibility of Dex. He could have, for instance, introduced testimony from an expert in the field of K-9 training and certification through affidavit or at the hearing. Instead, he relied solely on the incredible testimony of the onlookers outside Defendant's mother's residence. Furthermore, the Court has found that there was probable cause to search the Tahoe even before the positive alert. Thus, ultimately, the issue of Dex's training and certification is immaterial.

Blazer, we need not examine the Search Warrant, which was obtained after the vehicle had been towed to the Red Lake Police Department.").

> **B. Detective Rattigan did not search the Tahoe prior to the development of probable cause.**

As this Court previously explained:

> Defendant contends that "prior to obtaining the search warrants, Mr. Rattigan searched the Tahoe, discovered the white powder inside a bag on the front passenger seat, and falsely thereafter averred that he saw such a thing in advance of this 'free peak' [sic] . . . ." Def.'s Suppl. Br. at 5, ECF No. 41. So, in Defendant's view, there were actually two separate searches of the Tahoe – one when it was parked on Lemington Avenue immediately following his arrest and one when it was impounded at Police Headquarters – and neither search was supported by probable cause.

Mem. Order of Nov. 20, 2014, at 4, ECF No. 45. Defendant elaborates on this argument in his post-hearing supplemental brief, arguing that whenever Detective Rattigan took his "free peek" inside the Tahoe, allegedly before the development of probable cause, "the immediate 'fruit' of that search was the discovery of the sum of white powder in the shopping bag on the Tahoe's front passenger seat. That discovery led in turn and immediately to the empty gesture of 'calling for the dog.'" Def.'s Post-Hearing Br. at 8, ECF No. 61. Therefore, Defendant contends, the K-9 alert cannot be considered an independent source for the discovery of the evidence, and the evidence must be suppressed.

The Court is not convinced by this argument for two reasons. First, there is no credible testimony to support Defendant's theory. Although Alvin Burtch, Donald McCune, Jeanelle Cooper, and Angel Allen testified that they saw one of the officers – presumably Detective Rattigan – using some sort of device to attempt to pry open the Tahoe's passenger side window, the Court finds that their testimony on this point is not credible. Not only is this testimony inconsistent, with some of these witnesses testifying that they saw Detective Rattigan actually go

inside the vehicle, while others denying that they saw him enter the vehicle. *Compare* Hr'g Tr. at 28:14-16 (Burtch's testimony); 101:16-25 – 102:1-3 (Cooper's testimony) *with id.* at 67:2-5 (McCune's testimony); *id.* at 151:23-25 (Allen's testimony). It also makes no sense in light of the fact that the officers had the keys to the Tahoe. As Deputy Dwyer credibly testified, Defendant dropped the keys after he was ordered to the ground, and, thereafter, the keys were handed over to Detective Dwyer. Because Detective Dwyer had the keys to the Tahoe, he would have had no need to resort to the measures described by Defendant's witnesses. Additionally, as Detective Rattigan testified, the Tahoe was actually unlocked at this time, which makes it even more inconceivable that he would have needed to try to pry open the Tahoe's window with some unexplained device, as alleged by Defendant's witnesses. On the other hand, the Court credits Detective Rattigan's testimony that he did not attempt to pry open the Tahoe's passenger side window and that, while he was awaiting the tow truck's arrival, he entered the vehicle only briefly for the purpose of rolling up the windows so that it could be towed. This testimony was corroborated by Deputy Dwyer, who recalled that he never saw Rattigan attempt to enter the Tahoe through the passenger window but did see him briefly enter the vehicle through the driver-side door in order to close the windows.

Second, assuming, *arguendo*, that Detective Rattigan did search the Tahoe while it was parked in front of 7013 Lemington Avenue prior to the arrival of the K-9 unit, the result would be the same. Probable cause existed even before Dex's positive alert, so Detective Rattigan could have searched the Tahoe on the spot based on his observations of Defendant and the positive field test for cocaine. As a result, Dex's positive alert cannot be considered the fruit of any illegality, such that suppression of the evidence would be warranted.

## III. Conclusion

In sum, assuming that Defendant had a reasonable expectation of privacy in the Tahoe, there is no basis to suppress the evidence seized from that vehicle on November 1, 2013. The facts known to Detective Rattigan and his colleagues established probable to believe that drugs would be found inside. Under the automobile exception, probable cause was all that was required to enter the vehicle, both when it was parked outside the residence and whenever it was towed to Police Headquarters, where the actual search took place. Even if the warrant was somehow invalid, those issues are immaterial because no warrant was actually required to enter the Tahoe. For the foregoing reasons, Defendant's motion will be **DENIED**. An appropriate order follows.

McVerry, S.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) 2:14-cr-64 |
| v. | ) |
| | ) |
| KENYATTA ROBINSON, | ) |
|             Defendant. | ) |

## ORDER

**AND NOW**, this 17th day of March, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that DEFENDANT'S MOTION TO SUPRESS PHYSICAL EVIDENCE WITH CITATION OF AUTHORITIES (ECF No. 27) is **DENIED**.

                                                BY THE COURT:

                                                s/Terrence F. McVerry
                                                Senior United States District Judge

cc:      **Troy Rivetti, AUSA**
           Email: Troy.Rivetti@usdoj.gov

           **Amy L. Johnston, AUSA**
           Email: amy.johnston2@usdoj.gov

           **Thomas Livingston, AFPD**
           Email: Thomas_Livingston@fd.org